## Chicago & Alton R. R. Co. v. Statia B. Eaton, Adm'x, etc.

1. PRACTICE—*Where Leading Questions Are Proper.*—As a general rule, a party to a suit is prohibited from asking leading questions of his own witness; but when the evident purpose of his inquiry is to merely negative a fact or circumstance, a leading question is sometimes proper, and forms an exception to the general rule; as, where a witness is called to contradict another who had stated that such and such expressions were used, or the like, counsel are sometimes permitted to ask whether some particular expressions were used, or things said, instead of asking the witness to state what was said.

2. SAME—*Under What Circumstances Leading Questions May be Asked—Discretion of the Court.*—Under what circumstances leading questions may be put, is a matter resting in the sound discretion of the court, and is not a matter which can be assigned for error.

3. SAME—*Recalling a Witness for Further Cross-Examination.*—Where a witness has already answered substantially the same questions on his first cross-examination, the court may properly refuse to allow him to be recalled for further cross-examination upon the same matter.

4. FELLOW-SERVANTS—*Trackmen and Trainmen Are Not.*—Trackmen are not the fellow-servants of trainmen, as they do not co-operate in the same line of employment.

5. RAILROADS—*Can Not Delegate to Fellow-Servants Their Duty to Furnish a Safe Track for Their Trainmen.*—It is the duty of a railroad company to furnish a safe track for its trainmen, and to use reasonable care to keep it in such condition, and this duty it can not delegate to fellow-servants of the trainmen, and be released from liability merely because the persons to whom it delegated such duty were negligent.

6. SAME—*Negligence in Violating Their Own Rules.*—Where the rules of a railroad company require its trackmen "to use the utmost caution at all times, and when a rail is to be taken out of the track, or other work to be done which will render the track impassable, a flagman or red flag must be stationed in each direction 2,000 yards, or forty telegraph poles, distant, and torpedoes placed upon the rail, two lengths apart, on the engineer's side, or if in the vicinity of descending grades, the distance must be doubled," a failure to comply with the requirements of such rule by the trackmen will render the company liable for injuries resulting from such failure.

7. SAME—*Liability Where the Servants of the Company Are Sent to Perform a Duty and Fail.*—Where the rules of a railroad company require its trackmen, upon removing a rail from the track or upon doing other work which will render the track impassable, to station a flagman or place a red flag in each direction 2,000 yards, etc., if, upon removing a rail, the trackmen fail to comply with the requirements of the rule the company will be liable for injuries resulting from such failure.

C. & A. R. R. Co. v. Eaton.

**Trespass on the Case.**—Death from negligent act. Appeal from the Circuit Court of McLean County; the Hon. COLOSTIN D. MYERS, Judge, presiding. Heard in this court at the May term, 1901. Affirmed. Opinion filed September 11, 1901.

A. E. DeMANGE, attorney for appellant; WILLIAM BROWN, general solicitor, of counsel.

LOUIS FITZ HENRY and BARRY, MORRISSEY & FIFER, attorneys for appellee.

MR. JUSTICE WRIGHT delivered the opinion of the court.

This suit was by appellee, to recover for the death of Charles Eaton, her husband, caused, as alleged, by the wrongful act, neglect or default of appellant. The declaration alleges that plaintiff's intestate was a locomotive engineer employed on defendant's road. The negligence charged in the first count is that it was defendant's duty to provide a reasonably safe track, and to use reasonable care to keep it in safe condition, and if engaged in repairing it, or replacing rails thereon, to use ordinary care to warn trainmen, so that they, by the use of ordinary care, could put their trains under control, and thus avoid injury; that defendant, while making repairs, removed rails from the track near Lawndale, and the intestate, in charge of a locomotive engine and train of cars, in the exercise of ordinary care, approached the place, and defendant's servants failed to warn him in time that the rails were out, and in consequence he was killed. The second count alleges that defendant had in force a rule requiring that when a rail is taken out, a flagman or red flag must be stationed in each direction 2,000 yards, and two torpedoes placed on the rails; that defendant's servants carelessly and negligently removed rails without complying with this rule, and the intestate, in the use of ordinary care, approached the place where the rails were out, and not having been given warning or notice of the danger until it was too late to stop, was in consequence killed. The plea of the general issue was filed to the declaration and a trial by jury ended in a verdict and judgment against appellant for $5,000, to reverse which it brings this appeal to this court.

The errors relied upon for a reversal are that the court permitted leading questions to be asked of two of appellee's witnesses; refused appellant the right to ask material questions of Wilson, a witness for appellee, relative to statements made by him at the time of the accident; the court refused to direct a verdict for the appellant, on its motion, which motion should, as contended, have prevailed, because the evidence is not sufficient to support a verdict for the plaintiff; the court misdirected the jury, and modified and refused proper instructions.

As a general rule a party to a suit is prohibited asking leading questions of his own witness. Appellee was allowed in several instances upon the trial to ask such questions over the general objection of appellant, no specific objection relative to the leading quality of the questions having been urged at the trial. The questions were otherwise proper and designed to negative the existence of certain facts. When the evident purpose of an inquiry is to merely negative a fact or circumstance, a leading question is sometimes proper, and forms an exception to the general rule. To illustrate in this respect, some of the questions objected to, and others, fell in the same class, which were in the leading form, elicited the answers that no signals were given, no flags were out, and that the witness had not observed that the rail was out. At a later period in the trial appellant introduced evidence tending to show that signals were given, flags were out, and that the trainmen might have observed from all the indications there, that the rail was out. This evidence, to which objection had been made, was proper to contradict and negative what appellee's witnesses had said, and it was not improper for appellee to anticipate such evidence. Where a witness is called to contradict another, who had stated that such and such expressions were used, or the like, counsel are sometimes permitted to ask whether those particular expressions were used, or those things said, instead of asking the witness to state what was said. Indeed, when and under what circumstances leading questions may be put is a matter resting in the sound dis-

cretion of the court, and not a matter which can be assigned for error (Greenleaf on Evidence, Vol. 1, Sec. 435); unless, however, such discretion should be abused, and the party thereby prejudiced. Upon the whole evidence we do not believe such ruling of the court was prejudicial. Appellant recalled the witness Wilson for further cross-examination, and asked him if he did not say, while going to Lawndale upon a handcar, after the accident, "What in the world did that old man mean upon the hill? He was waving a flag at us as he was getting out of the ditch out of the way of the train. We did not know whether to stop the train or what he wanted." The court sustained an objection to this question; appellant excepted, and now insists that such ruling of the court is reversible error. Before the witness was recalled, and in his first cross-examination, appellant went into this subject, and the witness had already answered substantially the same question, and it was not error for the court to refuse a repetition of the same matter upon recalling the witness.

The train of which the deceased was engineer left Bloomington south at six o'clock of the morning of October 16, 1900, and consisted of an engine and sixty freight cars, part of them loaded. At this time appellant was engaged in relaying its tracks near Lawndale, a station about twenty-four miles south of Bloomington, and about four miles south of Atlanta, near the Vandalia crossing. There is down grade from Atlanta to Lawndale of 117 feet. The trackmen on the morning in question were working about a mile and a half north of Lawndale, and were taking up seventy-pound rails and relaying eighty-pound rails. These trackmen consisted of a section gang, working in advance, to the north of a steel gang, the latter laying the rails, and the former preparing the way for that purpose. Among the rules of appellant, adopted and promulgated for the guidance of all concerned, was rule number 74, as follows:

"Trackmen must use the utmost caution at all times, as under the telegraph system of working the road a train may be expected at any moment; when a rail is to be taken out, or other work to be done which will render the track

impassable, a flagman or a red flag must be stationed in each direction 2,000 yards, or forty telegraph poles, distant, and two torpedoes placed upon the rail, two rail lengths apart, and on the engineer's side. If it is in the vicinity of descending grades, the distance must be doubled; and the section foreman will be responsible for knowing that this is properly done."

Upon the approach of Eaton's train, appellee contends no flagman or red flag was stationed as required by the rule. No torpedoes were in fact laid. The train ran at rapid speed, as if no danger was ahead. The truth was the steel gang had removed one or more rails, and upon the approach of the train some of the section gang, and again the steel gang, gave signals for stopping, and it is in evidence the engineer did all in his power to stop the train, but his efforts to do so were too late and the engine ran into the gap where the rail had been taken out, turned over and killed the engineer.

Against the verdict it is argued by appellant that it did all that was reasonable under the circumstances to protect the trainmen; that if the rule was violated by the trackmen, or if they failed otherwise to give to the trainmen due and timely notice of the dangerous condition of the track, they were but the fellow-servants of the latter and for their negligence in that respect there could be no recovery. We do not concur in this view. The trackmen were not the fellow-servants of the trainmen. They were neither co-operating together in the particular business in hand, nor in the same line of employment. Besides, it was the master's duty to furnish a safe track, and to use reasonable care to keep it in such condition for the use of the trainmen, and he could delegate this duty to no one, not even a fellow-servant of the engineer, and thereby be released merely because his agent was negligent. The case then limits itself to the question whether the master had used reasonable care for the protection of the trainmen, and whether the engineer was in the exercise of ordinary care when injured. The rule of appellant to which we have referred, was an admission on its part that reasonable care

required the doing of the specific things, and in the manner stated in the rule. L. S. & M. S. R. R. Co. v. Ward, 135 Ill. 511. It is also true that if the evidence showed the performance of equivalent acts, or anything that would bring actual notice to the engineer, or which would be equivalent to notice to an ordinary person, under like conditions, of the dangerous condition of the track, such would exempt appellant from liability. To prove this, and that appellant used ordinary care, it is insisted that the train dispatcher at Bloomington, just before the train started, delivered to the engineer a bulletin, "Look out for the steel gang between Lincoln and Atlanta," and that Neal, the foreman of the steel gang, sent a man with orders to set a slow flag on the hill at Atlanta, a red flag seven telegraph poles south, and to place torpedoes on the rail between the two, and to tell the engineer of any train the location of the steel gang. If the bulletin was delivered, as contended, it alone would not excuse appellant, in view of its rule, from giving other warning of the condition of the track. If the engineer knew of the existence of the rule, and in the absence of evidence to the contrary—and there is none—it will be presumed that he did, the bulletin would mean to him to be cautious to observe the signals prescribed by the rule in case a rail was out. The steel gang themselves would not obstruct the track, or make it dangerous, unless a rail had been taken out; and the engineer had the right to presume if such condition existed he would be notified of it in due time, in accordance with the requirements of the rule. There is no claim that he was so notified, for there is no evidence that torpedoes were placed upon the track. Neither were flags placed as required by the rule. The deceased may have been and probably was, in compliance with the admonition of the bulletin, vigilant to recognize the signals described in the rule, and none of them having been given, he was lulled into a feeling of safety. The flagman sent by Neal did not accomplish the mission he was sent to perform, nor anything equivalent to it. He may have been upon the bank at the roadside with a flag, he may have placed a flag in

the ditch, but if all these things occurred as he testified, the trainmen did not understand them, and the flag in the ditch was not seen. The engineer saw none of them. In truth the flagman was suddenly met by the train, and in his effort and excitement to get out of its way, he did nothing discoverable that could be understood by an ordinary trainman indicating there was danger ahead. It is unreasonable to believe the engineer saw or heard anything done or said by the flagman to indicate danger, for if he had, his own instincts of self-preservation would have caused him to stop. When the servant of the master, set to perform the master's duty, thus fails, the master is liable, because it is his negligence, and the master's negligence is not one of the hazards assumed by the servant. It was the clear duty of the master to notify the servant in a way that an ordinary person would understand, of the extra hazard of the missing rail. This was not done.

It follows from what we have said that in our opinion appellant was guilty of the negligence charged, and that deceased was guilty of no contributory negligence leading to his injury, and that the verdict is supported by the evidence, and the court did not err in refusing to direct a verdict for appellant.

It is also complained that the court erred in giving the first instruction for the plaintiff, because it ignores the question of the negligence of a fellow-servant. We have already said that in our opinion the question of the negligence of fellow-servants does not arise in the case, and the instructions refused by the court, of which complaint is made, were properly refused for the same reason. There was no error in the modification of defendant's second modified instruction, as objected, by the substitution of the word "negligence" for the word "conduct." If the instruction had been given as asked, it would have, in effect, told the jury what constituted negligence, and such is not the province of the court, but of the jury, to determine as a question of fact.

Finding no reversible error in the record and proceedings of the Circuit Court, its judgment will be affirmed.